# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| URI LITVAK, and MARIANNE LITVAK,<br><br>    Plaintiffs,<br><br>    v.<br><br>VISTANA SIGNATURE EXPERIENCES, INC., MARRIOTT VACATIONS WORLDWIDE CORPORATION, ANDREW LAWRENCE O'CONNELL, IV, FLEX COLLECTION, LLC, and DOES 2 through 10,<br><br>    Defendants. | Case No. 8:24-cv-00139-JWH-KES<br><br>**ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS [ECF Nos. 17 & 21] AND DEFENDANTS' MOTION TO STAY [ECF No. 25]** |

Before the Court are the following matters:

- the Motion to Dismiss of Defendants Vistana Signature Experiences, Inc.; Marriott Vacations Worldwide Corporation; and Andrew Lawrence O'Connell, IV;[1]
- the substantially similar Motion to Dismiss of Defendant Flex Collection, LLC;[2] and
- the Motion of all Defendants to Stay Discovery.[3]

Plaintiffs Uri and Marianne Litvak oppose all three motions,[4] and the matters are fully briefed.[5] The Court concludes that these matters are appropriate for resolution without a hearing. *See* Fed. R. Civ. P. 78; L.R. 7-15. For the reasons detailed below, the Court **GRANTS** Defendants' Motions to Dismiss, **without prejudice**, for *forum non conveniens* and **DENIES as moot** Defendants' Motion to Stay.

## I.  BACKGROUND

### A.  Procedural History

The Litvaks filed their original Complaint against Defendants Vistana, Marriott, and O'Connell in Orange County Superior Court in December 2023, asserting claims for fraudulent misrepresentation, intentional concealment, civil theft, and unfair and deceptive trade practices.[6] In January 2024, those Defendants removed the action to this Court, asserting diversity jurisdiction.[7] Later that month, the Litvaks filed their First Amended Complaint—the operative pleading—which added Defendant Flex and claims for securities fraud and violations of the Vacation and Time-Share Act of 2004.[8]

---

[1]      Defs.' Mot. to Dismiss (the "First Motion to Dismiss") [ECF No. 17].

[2]      Def.'s Mot. to Dismiss (the "Second Motion to Dismiss") [ECF No. 21]. The Court notes that the substance of the First and Second Motions to Dismiss is substantially similar. For that reason, the Court will refer to both motions jointly as the "Motions to Dismiss."

[3]      Defs.' Mot. to Stay Disc. (the "Motion to Stay") [ECF No. 25].

[4]      Pls.' Opp'n to the Motions to Dismiss (the "Motions to Dismiss Opposition") [ECF No. 24]; Pls.' Opp'n to Motion to Stay [ECF No. 32].

[5]      Defs.' Reply in Supp. of Motions to Dismiss [ECF No. 28].

[6]      Compl. [ECF No. 1-1].

[7]      Notice of Removal [ECF No. 1].

[8]      First Am. Compl. (the "Amended Complaint") [ECF No. 11].

In February 2023, Vistana, Marriott, and O'Connell filed the First Motion to Dismiss.[9] In March 2023, Flex filed its substantially similar Second Motion to Dismiss.[10] All Defendants subsequently filed their Motion to Stay.[11]

### B.  Factual Allegations

#### 1.  The Parties

The Litvaks are a married couple who reside in Orange County, California.[12] According to the Amended Complaint, Defendants conspired to defraud the Litvaks with respect to the Litvaks' purchase of a timeshare.[13] Specifically, Vistana, Flex, and Marriott "provide[] accommodations, including but not limited to, timeshare interests and/or vacation ownership, 'exchange programs,' and short-term products," including the "multisite timeshare plan[] in which [t]he Litvaks purchased and/or accrued points for use within the multistate timeshare project, . . . a 'nonspecific timeshare interest,' with the right to use accommodations at more than one component site created by or acquired through the timeshare plan's reservation system."[14] O'Connell is a real estate broker, and he "was the sales representative for Defendants who presented the sales pitch [for the timeshare plan] to [t]he Litvaks."[15]

#### 2.  The Starwood-to-Marriott Conversion

The Litvaks were owners/members in a Starwood timeshare plan, "Starwood Vacation Ownership," at the Westin Maui Villas from 2002 to 2009, and again beginning in 2011.[16] "With Starwood Vacation Ownership, owners used a points-based program wherein 'StarOptions'—a form of currency—could be used to customize the units, seasons, and resorts that they had access to."[17] "Under the Starwood Vacation Ownership program, higher tier owners, like [t]he Litvaks, were permitted to convert their points into stays at other non-timeshare Starwood properties, and to use those

---

[9]   First Motion to Dismiss.
[10]  Second Motion to Dismiss.
[11]  Motion to Stay.
[12]  Amended Complaint ¶¶ 1 & 2.
[13]  *Id.* at ¶ 15.
[14]  *Id.* at ¶¶ 17 & 18.
[15]  *Id.* at ¶ 19.
[16]  *Id.* at ¶¶ 20-22.
[17]  *Id.* at ¶ 20.

points to purchase upgrades at various other resorts."[18] As of 2016, the Litvaks owned two different "every-other-year" units at the Westin Maui Villas, such that they were able to use the timeshare every year.[19]

"As an incentive to purchase additional units, [t]he Litvaks were given generous offerings of bonus points that could be used at any time anywhere in the world within the Starwood network."[20] "Every unit purchase by [t]he Litvaks included further accumulation of these valuable points, which had an equivalent cash value that was very stable. Because of their loyalty and additional unit purchases, [t]he Litvaks were promised 'Platinum Status,' which was recognized throughout the Starwood network, even at non-timeshare locations."[21] "Platinum Status also allowed [t]he Litvaks to earn even more bonus points, obtain free upgrades and exclusive privileges, and enjoy free meals at the Starwood properties."[22]

In September 2016, Marriot acquired Starwood, and as a result, and the Litvaks Starwood points were exchanged—three Marriott points for each Starwood point—to allow the Litvaks to use their points at Marriott properties.[23] The Marriott point system "greatly devalued the currency value of [t]he Litvaks' points because more points were required under the Marriott system than under the Starwood system," and the Marriott point system was "far more complicated than the Starwood point system."[24]

### 3. The "Ritz Carlton Upgrade"

In early 2022, Defendants solicited the Litvaks, offering them the "Ritz Carlton Upgrade," because the Litvaks "were staying primarily at 5-star properties on a regular basis, and were using large numbers of points for those bookings and upgrades."[25] The "Ritz Carlton Upgrade" cost the Litvaks $185,000 to purchase and, critically, it required that the Litvaks "forfeit ownership of their fully paid-for Westin Maui Villa units."[26] To induce the Litvaks to purchase the "Ritz Carlton Upgrade," Defendants offered the Litvaks 1.3 million bonus points to be used anywhere within the Marriott network,

---

[18] *Id.*

[19] *See id.* at ¶ 22.

[20] *Id.* at ¶ 23.

[21] *Id.*

[22] *Id.*

[23] *Id.* at ¶ 24.

[24] *Id.*

[25] *Id.* at ¶ 25.

[26] *Id.* (emphasis omitted).

"permanent Titanium Status," and the option to purchase approximately 3 million additional points for use anywhere within the Marriott network.[27] The Litvaks allege that Defendants did not disclose that the annual "maintenance fee" associated with their ownership interest would be $15,000—an increase from the approximately $4,000 that they paid for their Westin Maui Villas units.[28]

In February 2022, allegedly because of Defendants' "representations and inducements," the Litvaks purchased the "Ritz Carlton Upgrade" pursuant to a purchase and sale agreement with Flex.[29] The Litvaks assert that, with the upgrade, they expected "to receive a higher level of service, point redeemability, and quality of accommodations"; for example, the Litvaks "planned on using the 3 million bonus points at 5-star properties [like] the Ritz Carlton."[30]

According to the Litvaks, Defendants "failed to deliver what was promised."[31] As examples, the Litvaks allege that they "can no longer merely exchange a pre-determined number of points for a certain booking, upgrade, or other benefit," as "Marriott charges wildly different (greater) point amounts for the same bookings, upgrades, and other benefits" than the Litvaks had previously paid.[32] Furthermore, "some of the previous bookings, upgrades, and other benefits c[an] now no longer be purchased with [t]he Litvaks' points at all," since "[t]he inflationary pressure of the Marriott points purchased in 2021 has resulted in catastrophically reduced purchasing power for [t]he Litvaks' points."[33] The Litvaks assert that Defendants did not "disclose that Marriott would so inflate the supply of points that their purchasing power would be drastically reduced."[34] Moreover, the Litvaks argue that the 1.3 million bonus points "could only be used within the Vistana network (at 4-star properties like Westin and Sheraton)," not "anywhere within the Marriott network," including 5-star properties like the Ritz Carlton, as Defendants allegedly promised.[35] Finally, the Litvaks "were not immediately given their permanent Titanium Status," which would entitle them to room upgrades, as promised; instead "[i]t took several months before [t]he Litvaks were finally given their Titanium

---

[27]    *Id.* (emphasis omitted).

[28]    *Id.* at ¶ 26.

[29]    *Id.* at ¶ 27.

[30]    *Id.*

[31]    *Id.*

[32]    *Id.* at ¶ 28.

[33]    *Id.*

[34]    *Id.* at ¶ 29.

[35]    *Id.* at ¶ 30.

Status" and "[t]he Litvaks' requested room upgrades were not at all guaranteed," and "when room upgrades were requested, they were given virtually identical rooms with the exact same sets of features and amenities."[36] The Litvaks assert that they tried to "voice their disappointment to O'Connell, and to 'the powers that be' at Marriott," but "Defendants obstinately refuse to rectify the situation and provide [t]he Litvaks with the benefits of the bargain that were promised when they purchased the Ritz Carlton Upgrade."[37]

### C. Claims

The Litvaks assert the following six claims for relief against all Defendants:

- fraudulent misrepresentation;
- intentional concealment;
- civil theft pursuant to Cal. Penal Code § 496(c);
- unfair and deceptive trade practices pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL");
- securities fraud pursuant to Cal. Corp. Code §§ 25401 *et seq.*; and
- violations of the Vacation Ownership and Time-Share Act of 2004, Cal. Bus. & Prof. Code §§ 11210 *et seq.*[38]

The Litvaks seek an award of monetary damages, including interest, treble damages, attorneys' fees, restitution and disgorgement, exemplary damages, and costs.[39]

## II. LEGAL STANDARD

### A. Personal Jurisdiction

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a party may seek to dismiss an action for lack of personal jurisdiction. To defeat such a motion, the plaintiff must demonstrate that the exercise of personal jurisdiction is proper. *See Menken v. Emm*, 503 F.3d 1050, 1056 (9th Cir. 2007). In resolving such a motion, "uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Disputed facts are resolved in favor of the plaintiff. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). If the motion

---

[36] *Id.* at ¶ 31.

[37] *Id.* at ¶ 32.

[38] *See generally id.*

[39] *Id.*

is based upon written materials, then "the plaintiff need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). Therefore, the Court inquires only into whether the plaintiff's "pleadings and affidavits make a prima facie showing of personal jurisdiction." *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995). Although unrefuted assertions in the complaint must be taken as true, the plaintiff cannot "simply rest on the bare allegations of its complaint." *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977).

A plaintiff who seeks the Court's exercise of personal jurisdiction over a non-resident must meet the constitutional limits of due process and satisfy the long-arm statute of the forum state. *See Pebble Beach Co.*, 453 F.3d at 1154-55. California's long-arm statute is coextensive with constitutional due process. *See* Cal. Civ. Proc. Code § 410.10. Thus, when determining personal jurisdiction, federal courts in California must ensure that exercising personal jurisdiction satisfies due process.

A federal court may exercise personal jurisdiction over a non-resident party when the non-resident party has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1110–11 (9th Cir. 2002) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 326 (1945)). A district court "may exercise either general or specific personal jurisdiction over non-resident defendants." *Fed. Deposit Ins. Corp. v. British-Am Ins. Co.*, 828 F.2d 1439, 1442 (9th Cir. 1987).

With respect to general personal jurisdiction, corporations are considered at home in the state where they are incorporated and where they have their principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Beyond that, general jurisdiction may exist where a corporation engages in a substantial, continuous, and systematic course of business, but only when its "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* at 139 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

In contrast to general personal jurisdiction, specific personal jurisdiction "is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Goodyear*, 564 U.S. at 919 (citation omitted). A court has specific personal jurisdiction over a defendant in a particular action if the elements of the following "three-prong test" are satisfied:

> (1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and

> protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger*, 374 F.3d at 802 (citation omitted). "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

The first prong can be satisfied by showing either purposeful availment or purposeful direction, which are "two distinct concepts." *Pebble Beach Co.*, 453 F.3d at 1154. "A purposeful availment analysis is most often used in suits sounding in contract," while "[a] purposeful direction analysis . . . is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802.

**B.   Forum Selection Clause**

Under the doctrine of *forum non conveniens*, "a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). "To prevail on a motion to dismiss based upon *forum non conveniens*, a defendant bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). "Ordinarily, a plaintiff's choice of forum will not be disturbed unless the 'private interest' and the 'public interest' factors strongly favor trial in a foreign country." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir. 2001).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). When a valid forum-selection clause exists between the parties, district courts adjust the usual *forum non conveniens* analysis in three ways: (1) "the plaintiff's choice of forum merits no weight," and "[r]ather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted"; (2) the Court "should not consider arguments about the parties' private interests," because the parties, through the forum selection clause, have "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation"; and (3) a transfer of venue or

dismissal pursuant to a forum selection clause "will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* at 63-66 & n.8.

**C.     Failure to State a Claim**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir. 2002). Although a complaint attacked by a Rule 12(b)(6) motion "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). Accordingly, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which means that a plaintiff must plead sufficient factual content to "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" from which the Court can "infer more than the mere possibility of misconduct." *Id.* at 679.

Normally, Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also Horosny v. Burlington Coat Factory, Inc.*, 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015). Claims alleging fraud, however, are subject to a heightened pleading standard. *See* Fed. R. Civ. P. 9(b). Rule 9(b) requires that circumstances constituting a claim for fraud or mistake be pleaded with particularity. *See id.* That rule requires a plaintiff to "identify the who, what, when, where and how of the misconduct charged" as well as "what is false or misleading about a statement, and why it is false." *Ebeid* ex rel. *U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Additionally, it is well settled in the Ninth Circuit that the Federal Rules of Civil Procedure, including Rule 9(b), apply in federal court, "irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

### D. Incorporation by Reference

When adjudicating a motion to dismiss, the Court may invoke the "incorporation by reference" doctrine to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiffs'] pleading." *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042-43 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015), *cert denied* 577 U.S. 874 (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)) (internal quotations omitted).

### E. Leave to Amend

A district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). The purpose underlying the liberal amendment policy is to "facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Therefore, leave to amend should be granted unless the Court determines "that the pleading could not possibly be cured by the allegation of other facts." *Id.* (quoting *Doe v. United States*, 8 F.3d 494, 497 (9th Cir. 1995)).

### III. ANALYSIS

As an initial matter, the Court notes that the underlying contract between the Litvaks and Defendants, including the Purchase and Sale Agreement[40] and associated contractual documents,[41] is incorporated by reference throughout the Amended Complaint, including as the basis for each specific claim for relief. The Litvaks did not attach those documents to their Amended Complaint, but Defendants provided them to the Court and the Litvaks do not dispute the documents' authenticity. Therefore, the documents are properly considered to be incorporated by reference into the Amended Complaint. *See Northstar Fin. Advisors Inc.*, 779 F.3d at 1042-43.

---

[40]   Decl. of Amy Fitzpatrick [ECF No. 4], Ex. G (the "Purchase and Sale Agreement").

[41]   Decl. of Frances Solomon in Supp. of First Motion to Dismiss (the "Solomon Declaration"), Ex. A (the "Flex Collection Vacation Ownership Plan Purchaser's Acknowledgment") [ECF No. 18-1]; Solomon Declaration, Ex. B (the "Vacation Ownership Use Notification") [ECF No. 18-2]; Solomon Declaration, Ex. C (the "Receipt") [ECF No. 18-3]; Solomon Declaration, Ex. D (the "Vacation Ownership Plan Information Document") [ECF No. 18-4].

### A.     The Court Has Personal Jurisdiction Over All Defendants

First, Defendants argue that the Court lacks personal jurisdiction over Marriott, Vistana, and Flex (the "Entity Defendants").[42] The Litvaks assert specific personal jurisdiction[43] and their claims sound in tort, so the Court employs the "purposeful direction" test. *See Schwarzenegger*, 374 F.3d at 802.

To demonstrate purposeful direction, the Litvaks must meet the *Calder* test. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984); *see also Schwarzenegger*, 374 F.3d at 805. Under the *Calder* test, the Litvaks must show that Defendants "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that [Defendants knew was] likely to be suffered in the forum state." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017). "In applying this test, [the Court] must 'look[ ] to [Defendants'] contacts with the forum State itself, not [Defendants'] contacts with persons who reside there.'" *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). "Thus, a 'mere injury to a forum resident is not a sufficient connection to the forum.'" *Id.* (quoting *Walden*, 571 U.S. at 290). "Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.'" *Id.* (quoting *Walden*, 571 U.S. at 290).

Here, the Litvaks allege that O'Connell, the "sales representative for [all] Defendants," solicited the Litvaks in California to purchase the "Ritz Carlton Upgrade."[44] The Litvaks further allege that O'Connell acted as the agent of all Defendants.[45] Indeed, Defendants do not dispute that the Court possesses personal jurisdiction over O'Connell, nor do they dispute that O'Connell is their agent.

Furthermore, allegedly because of O'Connell's solicitation to them in California, the Litvaks formed a contractual relationship with all three Entity Defendants. The Litvaks purchased the Flex Collection Vacation Ownership Plan,[46] and the Vacation Ownership Plan Information Document makes clear the legal relationship among the Entity Defendants: the Flex Collection Vacation Ownership Plan provides the Litvaks

---

[42]     First Motion to Dismiss 8:24-11:25 (Marriott and Vistana); Second Motion to Dismiss 8:13-12:12 (Flex).

[43]     *See* Motions to Dismiss Opposition 8:21-12:20.

[44]     Amended Complaint ¶ 19; *see also id.* at ¶ 25 ("In or around January and February 2022, [t]he Litvaks were solicited by O'Connell, Flex, Marriott and Vistana . . . .").

[45]     *See id.* at ¶ 7.

[46]     *See generally* Purchase and Sale Agreement; Flex Collection Vacation Ownership Plan Purchaser's Acknowledgment; Vacation Ownership Use Notification; Receipt.

with ownership within the Vistana Signature Network (which Vistana operates),[47] and Marriott owns both Flex (the "Trust Developer") and Vistana (the "Trust Association Manager" and "Network Operator").[48] Finally, the Flex Collection Vacation Ownership Plan includes many properties in California that the Information Document lists as "participating and available for occupancy."[49] Therefore, taking the Litvaks' allegations of Defendants' agency relationship as true, *see Am. Family Ass'n*, 277 F.3d at 1120, O'Connell's solicitation of the Litvaks in California, on behalf of all Defendants, and the fact that Defendants maintain properties in California that are a part of the Vacation Ownership Plan that the Litvaks purchased, the Court concludes that the Entity Defendants' contacts with the state of California meet the *Calder* test and that the Court has specific personal jurisdiction over them.

### B. The Forum Selection Clause is Valid, and It Applies to All Defendants

Next, Defendants argue that this action should be dismissed pursuant to the forum selection clause in Section 18 of the Purchase and Sale Agreement,[50] which states that the contract "shall be governed by, construed under, and enforced in accordance with the laws of the State of Florida and that "[j]urisdiction and venue shall be proper only in Orange County, Florida."[51] As already discussed, the Litvaks formed a contractual relationship with all Entity Defendants and the Litvaks allege that O'Connell was the other Defendants' agent for the purpose of that contract.[52]

Notably, the Litvaks do not dispute the validity of the contract. Rather, they argue that the forum selection clause does not apply to their claims, that it cannot apply to any Defendants except Flex, and that it is void and unenforceable for public policy reasons.[53] None of the Litvaks' arguments is availing.

The Litvaks argue that the forum selection clause does not apply to their claims because they do not assert contract claims. The Litvaks cite *Manetti-Farrow, Inc. v. Gucci Am.*, Inc., 858 F.2d 509, 514 (9th Cir. 1988), for the proposition that "[c]ontractual forum selection clauses *may* be applicable to tort causes of action if resolution of the claims

---

[47]    *See* Vacation Ownership Plan Information Document 096-97 & 112.

[48]    *Id.* at 097-98 & 122.

[49]    *See id.* at 366-394.

[50]    First Motion to Dismiss 11:26-15:8; Second Motion to Dismiss 12:13-14:24.

[51]    Purchase and Sale Agreement § 18.

[52]    *See* Amended Complaint ¶ 7.

[53]    Motions to Dismiss Opposition 12:23-15:16.

requires interpretation of the contract containing the forum selection clause."[54] They argue that their two tort claims are not subject to the forum selection clause because those claims do not require an interpretation of the contract and that their remaining four claims are not subject to the clause because they are statutory claims.[55]

First, the Litvaks are wrong about their statutory claims: statutory claims—such as the Litvaks' claims here—can sound in tort. *See, e.g.*, *Ek v. Herrington*, 939 F.2d 839, 841 (9th Cir. 1991) ("[W]hether the plaintiff is in the class of protected persons is the threshold question of all statutory tort law."); *Velasquez v. United States*, 62 F.3d 1427, 1995 WL 453163, at *3 (9th Cir. July 31, 1995) ("Performing surgery without the informed consent of a patient is a statutory tort defined by Hawaii Revised Statutes § 671 et seq."). Here, the Litvaks' statutory claims for civil theft, unfair and deceptive trade practices, securities fraud, and violations of the Vacation Ownership and Time-Share Act of 2004 all sound in tort.

*Manetti-Farrow* states: "Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Manetti-Farrow*, 858 F.2d at 514. In that case, the plaintiff alleged that "[Defendant] Gucci Parfums instituted a price squeeze by raising prices substantially above what it charged other customers, that [Defendant] Gucci America fraudulently obtained Manetti–Farrow's customer lists and business information to solicit Manetti–Farrow's customers, that Gucci Parfums wrongfully neglected delivery orders, and that Gucci Parfums wrongfully abrogated the contract." *Id.* The Ninth Circuit concluded that "[e]ach of th[o]se claims relates in some way to rights and duties enumerated in the exclusive dealership contract" and "[t]he claims cannot be adjudicated without analyzing whether the parties were in compliance with the contract." Therefore, the Ninth Circuit held that, "because the tort causes of action alleged by Manetti–Farrow relate[d] to 'the central conflict over the interpretation' of the contract, they [we]re within the scope of the forum selection clause." *Id.*

Likewise, here, each of the Litvaks' claims is centered upon the underlying contract:

 1. Their first claim for fraudulent misrepresentation relates to Defendants' allegedly "superior knowledge of all aspects of the Ritz Carlton Upgrade terms, conditions, and limitations," *i.e.*, contractual provisions, and asserts that Defendants intended to "induce [t]he Litvaks to enter into the contract of sale to purchase the Ritz Carlton

---

[54] *Id.* at 12:25-27 (emphasis in original).

[55] *Id.* at 13:1-6.

        Upgrade, and then, to consummate the closing of said contract."[56] And the Litvaks seek a contractual remedy: the "rescission of the contract(s) and instrumentalities of the Ritz Carlton Upgrade purchase."[57]

2.     The second claim for intentional concealment asserts that Defendants "intentionally failed to reveal and disclose and affirmatively suppressed ... material information" with respect to "the Ritz Carlton Upgrade purchase contract(s)," and also seeks contract recission as the remedy.[58]

3.     The third claim for civil theft avers that Defendants violated Cal. Pen. Code § 496(c) via the "Ritz Carlton Upgrade" contract.[59]

4.     The fourth cause of action alleges that Defendants perpetrated unfair and deceptive trade practices with respect to the "Ritz Carlton Upgrade" contract.[60]

5.     The fifth cause of action asserts that Defendants perpetrated securities fraud with respect to the same contract and seeks recission of the contract.[61]

6.     Finally, the sixth cause of action alleges that Defendants violated the California Vacation Ownership and Time-Share Act of 2004 through the same contract and seeks recission of the contract.[62]

Each claim for relief depends entirely upon the underlying "Ritz Carlton Upgrade" contract, and the Litvaks seek recission of that contract as a remedy for multiple claims. Therefore, as in *Manetti-Farrow*, the forum selection clause applies, and this case should be dismissed and prosecuted, if at all, in Orange County, Florida. Because the issue may be cured by filing a subsequent action in the appropriate court in

---

[56]     Amended Complaint ¶¶ 36 & 37.

[57]     *Id.* at ¶ 45.

[58]     *Id.* at ¶¶ 47 & 54.

[59]     *See id.* at ¶ 58.

[60]     *See id.* at ¶ 68.

[61]     *See id.* at ¶¶ 75-85.

[62]     *See id.* at ¶¶ 86-96.

Orange County, Florida, the Court dismisses this action without prejudice. *See Lopez*, 203 F.3d at 1127 (quoting *Doe v. United States*, 8 F.3d at 497).

### C. The Court Will Not Reach the Merits of Defendants' Rule 12(b)(6) Motion or Motion to Stay Arguments

Because the Court concludes that this case should be dismissed pursuant to the valid forum selection clause, the Court will not explore the merits of Defendants' 12(b)(6) arguments. Likewise, the Motion to Stay is denied as moot.

### IV. DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1. Defendants' Motions to Dismiss for *forum non conveniens* are **GRANTED**.

2. This case is **DISMISSED without prejudice**. The Litvaks may refile, if at all, in the appropriate court in Orange County, Florida.

3. Defendants' Motion to Stay is **DENIED as moot**.

4. Judgment will issue accordingly.

**IT IS SO ORDERED.**

Dated: July 3, 2024

John W. Holcomb
UNITED STATES DISTRICT JUDGE